# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>ROBERT ODSOR HAMPTON III,<br><br>    Defendant. | Case No. 5:18-cr-40082-HLT |

## MEMORANDUM AND ORDER

Defendant Robert Odsor Hampton III, who is charged with possession of a firearm and ammunition by a prohibited person, moves to suppress the ammunition found in his pocket and the gun found in the vehicle in which he was riding. Although he concedes the validity of the initial traffic stop, he contends law enforcement violated his Fourth Amendment rights by unlawfully extending the scope of the traffic stop and unlawfully arresting him. Doc. 13. Because law enforcement did not violate Mr. Hampton's Fourth Amendment rights, the Court denies his motion.

**I.    BACKGROUND[1]**

At approximately 10:45 p.m. on July 12, 2018, Topeka Police Department ("TPD") Officers Christian Harsha and Joshua Fowler responded to the scene of a domestic complaint. Upon their arrival, Officers Harsha and Fowler took statements from Susan Dunn, who placed the 911 call, and the alleged victim, Michelle Hodgson. Ms. Hodgson stated that her ex-boyfriend,

---

[1] During the February 22, 2019 hearing on Mr. Hampton's motion to suppress, the Court heard testimony from three Topeka Police Department officers involved in the July 12, 2018 traffic stop and arrest of Mr. Hampton: Officer Harsha, Officer Qualls, and Officer Janes. Based on the officers' demeanor and attentiveness during questioning—and given that, at times, the officers conceded facts not helpful to the government's case—the Court credits their testimony in its entirety. Although the Court credits the entirety of each witness's testimony, the Court relays only those portions relevant to its resolution of the issues presented by the motion to suppress.

Mr. Hampton, had attempted to run her over in a car and had also pointed a gun at her. She identified the vehicle involved as a black Dodge Charger with a police-style spotlight on the driver side door. Ms. Dunn's statement was consistent with Ms. Hodgson's account of the incident. After taking the statements—and performing a database search that revealed Mr. Hampton's prior booking photos and criminal history—Officer Harsha cleared the call at approximately 11:35 p.m.

Approximately one minute later and three miles from the reported assault, TPD Officer Brady Qualls—unaware of the allegations made by Ms. Hodgson and Ms. Dunn—stopped a black Dodge Charger for expired registration. Like the vehicle allegedly involved in the earlier domestic assault, the car stopped by Officer Qualls had a police-style spotlight on the driver side door. Officer Qualls approached the vehicle and asked the two occupants for identification. The driver did not have a driver's license and instead produced a Hawaiian identification card bearing the name Betsy Droge. The passenger in the vehicle—a male sitting in the front passenger seat—stated he did not have any identification. Officer Qualls asked for his name and date of birth, and the passenger provided the name "Joshua Haggerty" and a corresponding birthdate. Officer Qualls also explained the reason for the stop and asked Ms. Droge if she was the owner of the car. She responded that she was not and that the car belonged to her mother, who had recently passed away.

Meanwhile, Officer Harsha, who had just finished clearing the earlier assault call, heard over the radio that Officer Qualls had stopped a black Charger. Officer Harsha promptly radioed TPD Officer Christopher Janes—who had responded to the scene of the stop to back up Officer Qualls—to inquire whether the vehicle had a police-style spotlight. Officer Janes replied that it did. Noting it was unusual for a civilian car to have a police-style spotlight—and given that the car stopped by Officer Qualls was identical in make, model, and color to the car involved in the alleged

2

assault and was also stopped close in both proximity and time—Officer Harsha warned Officer Janes that the occupant could be armed and then headed toward the scene of the stop.

After finishing the radio conversation with Officer Harsha, Officer Janes approached the Charger, where Officer Qualls was still standing at the driver side window. Officer Janes walked toward the passenger side window and asked the passenger for his name and identification. Again, the man identified himself as Joshua Haggerty. The passenger was sweating profusely, breathing heavily, and avoiding eye contact, which, based on Officer Janes's training, indicated that he might attack or attempt to flee. Given this behavior and his conversation with Officer Harsha, Officer Janes signaled to Officer Qualls that the man could be armed. Officer Qualls then returned to his patrol car to run a warrant search on Ms. Droge and the passenger while Officer Janes remained at the passenger side window of the Charger.

At this point, Officer Harsha arrived on the scene and approached Officer Qualls. Officer Harsha told Officer Qualls he thought the male passenger could be the suspect in the earlier domestic assault. Officer Harsha then asked Officer Qualls to pull the Social Security number for Joshua Haggerty and, after acquiring the number, approached the passenger side window and asked the man for the last four digits of his Social Security number. After the passenger responded that he did not remember the numbers, Officer Harsha—who now felt certain the man was lying about his identity—asked him to step out of the vehicle. As Officer Harsha reached through the car window to unlock the passenger door, however, he noticed the passenger reach toward his waistband. Unsure if he was reaching for a weapon or attempting to unbuckle his seatbelt, Officer Harsha instructed the man not to reach for anything and then reached in to help him undo the seatbelt. With Officer Janes's help, Officer Harsha assisted the passenger from the vehicle and, at

this point, Officer Harsha immediately recognized him as the suspect from the earlier assault—Mr. Hampton.

Officer Harsha attempted to place Mr. Hampton's hands behind his back to handcuff him, but Mr. Hampton resisted. With the assistance of the other officers on the scene, Officer Harsha pushed Mr. Hampton against an adjacent wall and successfully secured him. While Officer Harsha looked on, Officer Janes searched Mr. Hampton's person. During the search, Officer Janes noticed that Mr. Hampton was wearing an empty holster and, in Mr. Hampton's pockets, Officer Janes found four handgun magazines. Both Officers Harsha and Janes testified that the presence of the holster—without a gun—indicated there could be a gun at the scene.

Officer Harsha subsequently walked to the driver side window to speak with Ms. Droge. At this point, Mr. Hampton—who was still standing with Officers Qualls, Janes, and Fowler—broke free and dove headfirst into the Charger's open passenger door, yelling at Ms. Droge (who was still sitting in the driver's seat) to accelerate. Officer Harsha testified that, as Mr. Hampton dove into the car, he witnessed him again reach toward the vehicle's center console. At this point, Officer Harsha was confident the missing gun was located in the center console and feared that, were Mr. Hampton to access that area, the officers on the scene could be at risk.

To gain control of Mr. Hampton, Officer Janes deployed a two-second burst of OC spray into Mr. Hampton's eyes. Officer Janes was then able to pull Mr. Hampton out of the vehicle and restrain him. Once Mr. Hampton was secure, Officer Harsha searched the vehicle. Officer Harsha first checked the glove box. Officer Harsha next searched the center console, where he found a black Taurus, model 1911, .45 caliber pistol. Officer Harsha also ran a warrant search for Mr. Hampton and discovered he had two felony warrants. A warrant search was also conducted for Ms. Droge, revealing she likewise had an outstanding warrant and did not have a valid Kansas

driver's license. That warrant check was completed at approximately 11:52 p.m. The vehicle was subsequently seized and impounded.

Based on the evidence collected, a grand jury indicted Mr. Hampton on September 19, 2018, for possession of a firearm and ammunition by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Doc. 1. Mr. Hampton subsequently moved to suppress the gun and ammunition. Doc. 13.

## II. STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV; *see also Mapp v. Ohio*, 367 U.S. 643, 655-56 (1961) (incorporating the Fourth Amendment's protections against the states through the Fourteenth Amendment). Evidence obtained in violation of these rights is subject to suppression under the "exclusionary rule." *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

## III. ANALYSIS

Mr. Hampton contends law enforcement violated his constitutional rights during the July 12, 2018 traffic stop. Although he concedes the validity of the initial stop, he challenges the extension of the stop and his subsequent arrest and search. Specifically, Mr. Hampton first argues that law enforcement unlawfully extended the scope of the traffic stop because the officers' actions during the stop were not reasonably related to the purpose of the stop. Doc. 13 at 8-11. Second, Mr. Hampton contends the extension of the stop was not based upon a reasonable suspicion of criminal activity. *Id.* at 11-12. Third, Mr. Hampton argues that the officers lacked probable cause to arrest him, to search him, and to search the vehicle. *Id.* at 12-15. For all these reasons,

Mr. Hampton maintains that the "fruits" of the stop and arrest—namely, the gun and ammunition—must be suppressed.

In response, the government asserts that, as a threshold matter, Mr. Hampton does not have "standing" to raise the suppression issue because he has not claimed any possessory or ownership interest in the vehicle. Doc. 14 at 6-8. Alternatively, the government argues that Mr. Hampton's motion fails on the merits. *Id.* at 8-24. The government further argues that discovery of the gun was inevitable, providing an additional, independent basis for admissibility. *Id.* at 24-26. Because the standing argument, which appears to relate only to the gun and not the ammunition found on Mr. Hampton's person, is resolved by analyzing the merits, the Court begins by addressing Mr. Hampton's substantive challenges.

**A. Reasonably Related**

The constitutionality of a traffic stop is analyzed under the framework set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), which requires the court to (1) evaluate whether the stop was justified at its inception and (2) determine whether the officer's actions during the stop were "reasonably related in scope" to the circumstances justifying the stop in the first place. *United States v. Reynolds*, 729 F. App'x 639, 642 (10th Cir. 2018) (quoting *United States v. Morgan*, 855 F.3d 1122, 1125 (10th Cir. 2017)). Here, Mr. Hampton does not contest the legal justification for the stop. The question is therefore whether the officer's actions during the stop were reasonably related in scope to the mission of the stop itself.

During a stop, "an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings," and may also inquire regarding matters unrelated to the stop. *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). However, questioning on unrelated matters is improper if it "measurably extend[s] the duration of the stop"

and, to that end, a lawful traffic stop may not extend beyond the time "reasonably required" to effectuate the purpose of the stop. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614-15 (2015) (internal quotations omitted). Beyond that point, "[c]ontinued detention is lawful only if the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a 'reasonable suspicion' that the detained person is engaged in criminal activity." *Pettit*, 785 F.3d at 1379.

Mr. Hampton initially contends that Officer Qualls unreasonably extended the scope of the traffic stop by requesting his name and date of birth. Doc. 13 at 10. He argues that Officer Qualls requested this information before any other officers arrived and before Office Qualls could even arguably develop reasonable suspicion to extend the scope of the stop. *Id.* To support this argument, Mr. Hampton relies on the Ninth Circuit's non-binding decision in *United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019). *Id.* at 9-10.

The Court does not find this argument persuasive. On the facts of this case, Officer Qualls's request for identification did not measurably extend the length of the stop. Mr. Hampton was the only other individual in the vehicle, and he readily responded to the request—albeit with a false name and date of birth. Mr. Hampton's reliance on the Ninth Circuit's decision in *Landeros* is misplaced. In *Landeros*, the Ninth Circuit concluded that law enforcement officers may not extend a lawfully-initiated vehicle stop because a passenger refuses to identify himself absent reasonable suspicion that the individual committed a criminal offense. Importantly, Mr. Landeros refused to identify himself whereas Mr. Hampton never refused and, instead, provided the requested information. *See Landeros*, 913 F.3d at 870 (expressly not deciding whether law enforcement's first request for identification was lawful).[2]

---

[2] *Landeros* principally relies on the Supreme Court's holding in *Rodriguez*. The Court notes, however, that in *Rodriguez* law enforcement stopped the vehicle for a minor traffic violation and requested identification from

**B. Reasonable Suspicion**

Next, Mr. Hampton argues the officers lacked reasonable suspicion for extending the stop to run routine searches on him. The Supreme Court defines reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity" under a "totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The government bears the burden of proving the reasonableness of the officer's suspicion. *Pettit*, 785 F.3d at 1379. However, this is not an "onerous standard" and, indeed, requires "considerably less" than a preponderance of the evidence and "obviously less" than probable cause. *Id.* (quoting *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011); *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013)). "As long as an officer has 'a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality.'" *Id.* at 1379-80 (quoting *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)).

Here, the Court finds the officers had reasonable suspicion for extending the traffic stop to run the routine searches. Upon stopping the Charger, Officer Qualls asked the occupants for identification. The driver, Ms. Droge, did not have a driver's license, only a Hawaiian identification card. The passenger, later revealed to be Mr. Hampton, professed that he did not have any identification card, providing only a name and date of birth. The Charger also had expired tags and was not registered to either the driver or passenger; Ms. Droge stated that it belonged to her deceased mother. Officer Qualls testified that he had to run routine searches and determine whether anyone could even legally drive the car.

---

both the driver and the passenger and ran checks on both of them. *Rodriguez*, 135 S. Ct. at 1612-13. Although not specifically discussed in the opinion, the Supreme Court did not express any concern with this scenario.

Before Officer Qualls even returned to his patrol car to begin running those searches, Officer Janes arrived at the scene of the stop and signaled to Officer Qualls that the passenger was potentially armed. At this point, Officer Janes also observed the passenger sweating profusely, breathing heavily, and avoiding eye contact, which indicated to Officer Janes that the man was potentially armed or could try to flee.

Officer Harsha arrived shortly thereafter with knowledge of the earlier domestic assault and of the potential that the passenger was the suspect in that assault. Indeed, at the moment he arrived at the scene of the stop, Officer Harsha was aware that the vehicle stopped by Officer Qualls matched the description of the vehicle involved in the assault—a black Dodge Charger with a police-style spotlight on the driver side (which, significantly, was an unusual feature on a civilian vehicle)—and was also stopped close in time and proximity to the assault. After speaking with Officer Qualls, Officer Harsha further learned that the man was not carrying identification and had provided the name "Joshua Haggerty." With this information, Officer Harsha approached the vehicle to question the passenger about his identification and further learned that the passenger was unable to provide the last four digits of Mr. Haggerty's Social Security number. At this point, Officer Harsha was certain the man was lying about his identity and had also confirmed that the man strongly resembled the suspect from the earlier assault. Significantly, Officer Qualls had not yet completed the warrant searches.

Under the totality of the circumstances, the Court finds that, before Mr. Hampton's arrest, there was at a minimum reasonable suspicion that Mr. Hampton was engaged in illegal conduct, warranting the extended detention, the running of searches, and the investigation into his identity. For these reasons, the Court finds Mr. Hampton's second argument unpersuasive.

**C. Probable Cause**

Mr. Hampton's final argument is that his arrest was not supported by probable cause and, therefore, the evidence collected during the subsequent search of his person and the vehicle was inadmissible as the fruit of an illegal seizure. Doc. 13 at 12-15. The validity of a warrantless arrest hinges on "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The government bears the burden to establish probable cause to support an arrest. *United States v. Valenzuela*, 365 F.3d 892, 902 (10th Cir. 2004).

Here, Mr. Hampton contends he was arrested when law enforcement asked him to step out of the Charger. Although the Court questions whether he was arrested at this point (as opposed to when he was out of the vehicle and placed into handcuffs),[3] the Court need not resolve this issue because, under either scenario, the Court finds the government had probable cause to arrest Mr. Hampton. As set forth in Part III.B, *supra*, before the arrest, Officer Harsha was aware that the vehicle stopped by Officer Qualls was identical in make, model, and color to the vehicle reportedly involved in the assault. Moreover, both the vehicle involved in the assault and the vehicle stopped by Officer Qualls had a distinguishing feature, i.e., a police-style spotlight on the driver side. The traffic stop was only three miles from the reported assault and occurred

---

[3] In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), the Supreme Court held that ordering a driver out of a car during a *Terry* stop is a *de minimis* intrusion on the person's liberty interests. "The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." *Id.* at 111. Concern for officer safety was a primary reason for the decision. *Id.* at 109-11. The case arose from a traffic stop for an expired tag and the State conceded that the officer "had no reason to suspect foul play from the particular driver at the time of the stop; there having been nothing unusual or suspicious about his behavior." *Id.* at 109. The Supreme Court later explicitly extended *Mimms* to passengers. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997). In that case, the passenger—as here—"was sweating and also appeared extremely nervous." *Id.* at 410-11.

approximately an hour later. The passenger in the Charger had provided a name—Joshua Haggerty—but was unable to provide the last four digits of the corresponding Social Security number, giving rise to suspicion that the man was lying about his identity. Officer Janes also noticed the passenger behaving in a nervous manner—sweating profusely, breathing heavily, and avoiding eye contact.

Significantly, Officer Harsha also testified that—before he even removed the man from the Charger—he observed a strong resemblance between the passenger and the suspect from the assault. And, at the time the passenger was physically removed from the car, Officer Harsha immediately recognized him as Mr. Hampton based on the booking photo he had accessed earlier in the night. At this point, Officer Harsha (with assistance from the other officers at the scene) attempted to handcuff Mr. Hampton, who was resisting. After pushing Mr. Hampton up against a wall, the officers were able to get him into custody.

The facts and circumstances within the officers' knowledge at the time Mr. Hampton was arrested—either at the time he was asked to exit the vehicle or shortly after he exited—were sufficient to warrant a reasonable person in believing that Mr. Hampton was the alleged perpetrator of the earlier assault. Mr. Hampton's arrest was therefore supported by probable cause and, as such, he was not illegally seized. Following the arrest, Officer Janes lawfully performed a search of Mr. Hampton's person and located the ammunition. Because the seizure was lawful, there was no Fourth Amendment violation and there is no basis to suppress the ammunition.

Officer Harsha subsequently performed a search of the vehicle and located the gun. The gun and ammunition evidence is not the fruit of a Fourth Amendment violation and, therefore, suppression is not warranted.[4]

---

[4] Even if Mr. Hampton's detention was an unlawful seizure, the motion to suppress must still be denied with respect to the gun found in the vehicle because Mr. Hampton fails to satisfy the "factual nexus" component of the

## IV. CONCLUSION

Law enforcement had a valid basis for stopping the vehicle and did not unlawfully extended the scope of the traffic stop. Law enforcement also had reasonable suspicion for extending the stop, and eventually developed probable cause to arrest Mr. Hampton, to search him, and to search the vehicle.

THE COURT THEREFORE ORDERS that Defendant's Motion to Suppress (Doc. 13) is DENIED.

IT IS SO ORDERED.

Dated: March 18, 2019

/s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE

---

*DeLuca*/*Nava-Ramirez* test. Mr. Hampton acknowledges that he cannot directly challenge the search of the vehicle and, rather, contests the lawfulness of his own detention and seeks to suppress the gun as the "fruit," or derivative evidence, of that detention. The Tenth Circuit has held that, to prevail on such a theory, a passenger must show that (1) the detention violated his Fourth Amendment rights, and (2) a factual nexus exists between the illegal detention and the challenged evidence. *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001); *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000). To show such a nexus, a passenger must establish that "but for his, and only his," unlawful detention, the evidence would not have been found. *DeLuca*, 269 F.3d at 1133. Mr. Hampton has not shown, and cannot show, that had he been allowed to walk away from the scene at the time the stop was made, the gun would not have been found. *See id.* Thus, he fails to establish a factual nexus and the Court denies the motion as to the gun on this basis.

Further, even if Mr. Hampton could show a factual nexus, there is no basis to suppress, because the government has shown an independent lawful means of discovery of the gun. Officer Qualls testified that, regardless of Mr. Hampton's detention, the vehicle would have been impounded because it could not be legally driven with an expired registration. The vehicle would then have been searched pursuant to the TPD's inventory-search policy and the gun would have been found. Thus, the Court denies the motion with respect to the gun on this basis as well.